Chip Giles

LEGACY LEGAL GROUP, Chartered
Attorneys at Law
285 N.W. Main
P.O. Box 1047
Blackfoot, Idaho 83221

(208) 785-4700
Fax No. 785-7080
ISB #9135

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
# IN AND FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBIN JUKER, individually as the natural father of MACEY JADEN JUKER, a deceased person, SHERRY FRANCIS individually as the natural mother of MACEY JADEN JUKER a deceased person and JORDIN JUKER SCHMIDT individually as the natural sister of MACEY JADEN JUKER a deceased person, and the ESTATE OF MACEY JADEN JUKER<br><br>Plaintiffs<br><br>v.<br><br>CHASE FIDDLER, in his official and individual capacities, JASON PIETRZAK, in his official and individual capacities, RYAN POLLARD, in his official and individual capacities KIRK RUSH in his official and individual capacities, CRAIG SOUSA, in his official and individual capacities, DOMINIC ROGERS, in his official and individual capacities, JACOB LEE in his official and individual capacities, JONATHAN HOWARTH in | Case No. 1:2025cv00304<br><br><br><br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

**COMPLAINT AND DEMAND FOR JURY TRIAL - 1**

his official and individual capacities, BOISE POLICE DEPARTMENT a political subdivision of the State of Idaho, RON WINEGAR, in his individual and official capacities CITY OF BOISE, a political subdivision of the state of Idaho JOHN or JANE DOES # 1-10, whose true identities are presently unknown.

COMES NOW Plaintiff Robin Juker, by and through his attorney of record, Chip Giles of Legacy Law Group and herewith alleges, avers, claims and states as follows as to causes of actions against Defendants:

## INTRODUCTORY STATEMENT

1. This is a wrongful death and civil rights action pursuant to 42 U.S.C. § 1983, filed by Plaintiffs for violations of Macey Jaden Juker's (hereinafter "Juker") right to be free from the excessive use, by law enforcement officers, of lethal force, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, to be free from harm attributed to an unlawful conspiracy to conceal the use of excessive force and thereby violate Juker's civil rights, and for Juker's heirs to be compensated for Juker's wrongful death, which death was determined to be a homicide by autopsy and *post mortem* examination and was stated as such on the death certificate of Juker filed by the Idaho Bureau of Vital Records and Health Statistics of the Idaho Department of Health & Welfare.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over Plaintiffs' claims of violations of Juker's federal, constitutional rights pursuant to 28 U.S.C. §§1331 and 1343. This action is authorized and instituted pursuant to 42 U.S.C. §§1981a, 1983, 1985, and 1986. This

Court has supplemental jurisdiction of Plaintiffs' state law claims for wrongful death pursuant to 28 U.S.C. §1367.

3. The actions complained of herein took place in Boise, Ada County, Idaho, which is within the jurisdiction of the United States District Court for the District of Idaho, in that one or more of the Defendants reside(s) in Idaho and has sufficient minimum contacts with this District to warrant personal jurisdiction here, and Plaintiffs' claims for relief arose in this District. Accordingly, personal jurisdiction and venue in this District are proper under 28 U.S.C. §1391.

### PARTIES

4. ROBIN JUKER, (hereinafter "Robin") individually as the natural father of JUKER, a deceased person, is now and at all relevant times herein was a resident of Buhl, Twin Falls County, Idaho; is entitled to bring the § 1983 action on behalf of his deceased son, Juker, and he may recover all damages to which he is entitled as a result of Defendant's actions.

5. SHERRY FRANCIS (hereinafter "Sherry") individually as the natural mother of JUKER a deceased person is now and at all relevant times was a resident of Boise, Ada County, Idaho; is entitled to bring the § 1983 action on behalf of her deceased son, Juker, and she may recover all damages to which she is entitled as a result of Defendant's actions.

6. JORDIN JUKER SCHMIDT (hereinafter "Jordin") individually as the natural sister of JUKER a deceased person, is now and at all relevant times was a resident of Santa Clara, County, Palo Alto California; is entitled to bring the § 1983 action on behalf

of her deceased brother, Juker, and she may recover all damages to which she is entitled as a result of Defendant's actions.

7. The ESTATE OF MACEY JADEN JUKER, a deceased person, is a decedent's estate properly created under the laws of the state of Idaho, and Sherry Francis as the personal representative of that estate.

8. Defendant, CHASE FIDDLER (hereinafter "Fiddler"), was at all time relevant hereto acting under the color of state law as an employee and police officer with the Boise Police Department. Defendant Fiddler is sued in his individual and official capacities. Fiddler was on location at the scene when Juker was killed.

9. Defendant, JASON PIETRZAK (hereinafter "Pietrzak"), was at all time relevant hereto acting under the color of state law as an employee and police officer with the Boise Police Department. Defendant Fiddler is sued in his individual and official capacities. Pietrzak was on location at the scene when Juker was killed.

10. Defendant, RYAN POLLARD (hereinafter "Pollard") was at all time relevant hereto acting under the color of state law as an employee and police officer with the Boise Police Department. Defendant Fiddler is sued in his individual and official capacities. Fiddler was on location at the scene when Juker was killed.

11. Defendant, KIRK RUSH (hereinafter "Rush") was at all time relevant hereto acting under the color of state law as an employee and police officer with the Boise Police Department. Defendant Fiddler is sued in his individual and official capacities. Rush was on location at the scene when Juker was killed.

12. Defendant, CRAIG SOUSA (hereinafter "Sousa") was at all time relevant

hereto acting under the color of state law as an employee and police officer with the Boise Police Department. Defendant Sousa is sued in his individual and official capacities. Sousa was on location at the scene when Juker was killed.

13. Defendant, DOMINICK ROGERS (hereinafter "Rogers") was at all time relevant hereto acting under the color of state law as an employee and police officer with the Boise Police Department. Defendant Rogers is sued in his individual and official capacities. Rogers was on location at the scene when Juker was killed.

14. Defendant JOHNATHAN HOWARTH (hereinafter "Howarth") was at all time relevant hereto acting under the color of state law as an employee and police officer with the Boise Police Department. Defendant Howarth is sued in his individual and official capacities. Howarth was on location at the scene when Juker was killed.

15. Defendant, CITY OF BOISE (hereinafter "Boise") is a political subdivision of the state of Idaho. As a local, governmental entity, Boise is a suable person under 42 U.S.C. § 1983. At all times relevant to this Complaint, Boise employed Defendants Fiddler, Pietrzak, Pollard, Rush, Sousa, Rogers, Lee, Howarth, Winegar and several of the Doe Defendants, these defendants were acting pursuant to Boise's laws, customs, and/or policies. As the employer of Fiddler, Pietrzak, Pollard, Rush, Sousa, Rogers, Lee, Winegar, Howarth and the Doe Defendants, Boise is vicariously liable for all of the tortious and unconstitutional acts and omissions of Fiddler, Pietrzak, Pollard, Rush, Sousa, Rogers, Lee, Howarth, Winegar and the Doe Defendants, committed within the course and scope of their employment.

16. Defendant, BOISE CITY POLICE DEPARTMENT (hereinafter "BPD"), is a department within Boise.

17. Defendant Ron Winegar (Hereinafter "Winegar"), was, at the time of the relevant events, the Chief of BPD. Defendant Winegar is sued in his individual and official capacities.

18. Defendants, JOHN AND/OR JANE DOES #1-10 ("the Doe Defendants") whose true identities are presently unknown, were at all times herein members of the law enforcement departments named herein and employed by Boise. At all material times, the Doe Defendants were acting under the color of state law. The Doe Defendants are each sued in their individual and official capacities. The Doe Defendants are sued as a result of their involvement in the circumstances set forth herein and will be identified and named as party-defendants herein, if necessary, as discovery is obtained. Conversely, the Doe Defendants are individuals or entities, political, corporate, or otherwise, whose true identities are unknown at the present time, but who engaged in activities and conduct set forth herein. Alternatively, John/Jane Does I through X are individuals or entities who are now, or at the material and operative times were, the agents, employees, independent contractors, subdivisions, franchisees, wholly-owned subsidiaries, or divisions of Defendants herein, or are individuals or entities acting on behalf of, or in concert with, the other Defendants named herein.

**FACTUAL BACKGROUND**

19. On July 26th, 2023 Juker was at his residence located at the 700 block of N. 20th St. Boise, Ada, Idaho.

18. Juker had spoken with his mother Sherry at approximately 6:00 p.m. and at that time was not under the influence of alcohol.

20. Juker called Sherry later at approximately 8:45 and asked if she was at the door to

his residence. Sherry replied no, that she was on her way to the Boise airport to pickup his sister, Jordin Juker Schmidt ("Jordin").

21. Later that evening, July 26th, 2023 at approximately 10:24 p.m. Juker called the Ada County Dispatch 911 emergency line. Juker reported there were people trying to force entry into his residence to kill him. Juker also explained to dispatch that he had consumed alcohol and that "radiation was melting his brain." Juker was in a panicked, hallucinogenic state and in fear for his life.

22. Upon information and belief, Lee happened to be in the area. Lee responded to a subject at the door call at Juker's residence in the area of 20th and Washington in Boise, Ada, Idaho.

23. Upon information and belief Juker had reported the following to Ada County Dispatch: "There's people outside my house and they're trying to get in and kill me, I don't know if you guys should come, I don't know how powerful they are." Juker also advised he "cannot see them but he can feel them hitting him and they're talking to him," "unknown how many people, 23?" and "The radiation is melting my brain."

24. Lee was concerned whether Juker's call was a crisis issue. Dispatch quickly confirmed that Juker was in a crisis state, possibly drug induced.

25. Juker had also informed dispatch he had a firearm, and that he was home alone. Lee then decided to contact Juker directly by phone for some reason, rather than responding to Juker's residence.

26. Lee stopped in the parking lot/strip mall area of Albertsons located at 1650 W. State Street. Lee advised other officers to come meet him at the same location. Lee did not contact the mental health response team or a crisis negotiator.

27. Lee was then able to contact Juker directly. Juker told Lee that he had been drinking, he guessed that he had purchased some heroin, that some guys were at his residence and that they were using a laser. Juker did not know the "guys" that were there, but asked Lee to not approach them.

28. Juker told Lee that he "felt like hurting himself," but did not respond when Lee asked him if he was suicidal. At that point approximately six shots could be heard over the phone and outside the window of Lee's police cruiser.

29. Lee proceeded with Johnathan Howarth ("Howarth") and Johnathan Rodgers ("Rodgers") to the area of State and 21st since Lee wasn't exactly sure where the shots came from.

30. A brief time later other officers advised they had contacted a male with a firearm near the area of 19th and Resseguie and advised they were trying to take that male into custody.

31. After speaking with Officer Lee, Juker was walking and came up behind Rush and Pollard in the 600 block of North 19th Street.

32. Juker was undoubtedly scared, intoxicated, suicidal, suffering from hallucinations and a diminished mental state. Juker was armed with a rifle, but complied fully with Rush and Pollard's commands, placing the rifle down some distance from him, and then placing his hands on his head. Juker remained in that position for some time.

33. Juker was not taken into custody at this time, when he was far from his weapon and was completely compliant with law enforcement, on his knees with his hands on his head. Even though Juker was suffering a mental health crisis, neither the mental health response team nor a special negotiator were contacted.

34. Juker was told to walk toward law enforcement, to distance himself further from the rifle. Juker complied, walking towards law enforcement approximately 15 yards from the rifle. It is unknown while he was compliant why officers did not tell him to walk farther from the rifle, or just take him into custody. Juker was told to stop and get down on his knees with his hands above his head, which he did. Again, neither the mental health crisis team nor a special investigator were ever contacted.

35. It was mentioned by one law enforcement officer that they were "going to end this pretty quick," perhaps indicating an intent to simply kill Juker rather than follow standard protocols, bring in a special negotiator and contact the mental health crisis team. At this time Juker was clearly fixated on a strong fear of law enforcement.

36. Upon information and belief, at this time Juker was only under investigation for unlawful discharge of a firearm, and perhaps resisting and obstructing law enforcement personnel, both misdemeanor crimes under Boise City and Ada County criminal codes.

37. As numerous law enforcement closed in on Juker, with emergency lights and sirens activated, Juker jumped up to run and grabbed his rifle.

38. While on the run, Juker fired his weapon seemingly in the air, and was then shot by officers multiple times. As Juker was being shot, he did fire his weapon, no one (law enforcement bystander or otherwise) was injured by any of these shots.

39. According to the scene investigation 26 rounds of 9mm were fired by law enforcement and 7 rounds of 223 for a total of 33 rounds.

40. Rodgers arrived at Ellis and 19th Street on July 26, 2023 and observed Juker being contacted by law enforcement.

41. Rodgers took cover behind a tree, while another officer gave verbal commands.

42. Juker took off running and grabbed something off the car, Rogers assumed it was a weapon.

43. Rodgers stated in his investigation that Juker then fired his weapon. Only at this time could Juker have been under investigation or suspected of any felony crime.

44. Rodgers followed Juker to the area of Washington and 19th on foot. Rogers took cover behind a tree, and fired at Juker. Rogers believed he fired 3-5 shots total.

45. At that point Juker dropped his firearm and no further shots were fired by law enforcement.

46. Sergeant Miller then took command and extracted Juker from the weapon.

47. Rogers assisted in a search of a residence to make sure there were no further injuries.

48. Officer Rogers was then sequestered under CTIF protocols.

49. Rogers verbal commands to Juker were to stop in a loud, directive voice.

50. Peitrzak was advised by Ada County Dispatch of shots fired while he was traveling southbound on 15th street.

51. Pietrzak located the crisis call, and drove to the area where it was reported.

52. Pietrzak parked at 19th and Resseguie street and met with Rush.

53. Pietrzak only knew Rush was there, but no other officers were present.

54. Pietrzak saw Juker on his knees, with his hands over his head, complying with law enforcement demands.

55. Juker was approximately twenty to twenty-five yards from Rush and Pietrzak.

56. Pietrzak thought Juker was not going to be cooperative and did not contact the

mental health crisis team or a special negotiator. At this time Juker was clearly fixated on a strong fear of law enforcement.

57. Juker got up and ran after being ordered to stop.

58. Juker picked up a rifle which was located approximately ten to fifteen yards south of where he was detained by law enforcement and appeared to shoot in the air.

59. Rush was on the right side of Pietrzak.

60. Pietrzak went to the east side of the street to prevent Juker from entering a residence.

61. Juker began shooting towards officers who were on the west side of 19th and 13th Street to Pietrzak's right. Pietrzak shot at Juker two times.

62. Verbal commands were given to Juker to stop.

63. Pietrzak saw the muzzle flash from Juker's gun, then Juker ran south and stopped in the intersection of 19th and Washington, where Juker again shot his weapon.

64. Juker fell to the ground with the gun, Pietrzak could see him continue to hold his head up, Juker did not communicate with officers and again shot his weapon.

65. Pietrzak shot two more times, believing he hit Juker. Juker stopped shooting.

66. Pietrzak knew Juker was initially being compliant with law enforcement.

67. Pietrzak directed Juker to drop the gun with a direct tone.

68. Pietrzak calls a K9 unit, and has contact with an uninjured bystander

69. Howarth was on foot, he went to his patrol vehicle and moved it to the intersection of 21st street and Ellis. Howarth and other officers began to run down Ellis street, at the end of the block Howarth and other officers approach additional patrol vehicles with their lights activated.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 11**

70. While Howarth was running down the other block, gunfire could be heard. Howarth crouched behind a tree, and then got up and ran towards the gunfire.

71. Fiddler, Pollard, Rush, and Souza were also identified as officers who fired their weapons.

72. Pollard was shown by his body camera to be swapping out a magazine on his firearm.

73. Rush retrieved his rifle from the backseat of his vehicle. He then commanded Juker to "drop the gun" and "get your hands above your head." Rush "clears the air" over the police radio, and advises they are in contact with a suspect containing a "long gun." Rush witnesses Juker following commands and being compliant with law enforcement.

74. Juker is advised to get on his knees, and Juker complies. Pietrzak arrives and Rush briefs him.

75. Rush moves south along the west curb of N. 19th Street. Commands to stop can be heard as well as gunshots while Rush moves south. Gunfire continues to be heard as Rush crossed the street. By the time Rush reaches the vehicles on the east side of the street, Juker can be seen lying in the road on W. Washington Street.

76. Sergeant Rush can hear commands to "drop the gun" along with intermittent shots from officers. Juker is still moving, and Rush shoots four times total.

77. Rush assumes incident command and advises the same by radio.

78. Sousa is running while multiple gunshots can be heard and approaches the location of the shooting southbound on N. 19th Street. Sousa appears to shoot his weapon while positioned at the hood of Fiddler's vehicle.

79. Fiddler was identified as also having discharged his weapon during the shooting.

80. The shots that were eventually fired killed Juker. The autopsy listed his death as homicide from multiple gun shot wounds from rifles and handguns. Medical records show that Juker was shot 9 times. The shooting occurred after Juker was compliant with officers, approximately 15 yards from his weapon, on his knees with his hands above his head. Law enforcement was well aware of Juker's mental and physical state, and even though Juker was initially compliant for some time, ignored numerous opportunities to detain Juker without the use of deadly force. Additionally, the mental health crisis team and a specially trained crisis negotiator were never contacted.

81. The use of a firearm constitutes the use of lethal force and, upon information and belief, pursuant to the established policy of Boise and BPD, is "using only the amount of force necessary to protect officers or others from imminent danger of death or serious bodily injury." It also allows for the use of deadly force to prevent the escape of a felony suspect if their freedom is believed to pose a significant threat to officer or others. Even without this policy, properly-trained officers would not delay an opportunity to take a complaint suspect, on his knees, with his hands in the air and far away from his firearm into custody. Had officers followed Boise and BPDs policy and protocol associated with safely taking a suspect into custody to include contacting the mental health response team and a special negotiator Juker would have been arrested and detained during the time when he was being compliant, on his knees with his hands on his head and at least 15 yards away from any weapon.

Boise and BPD's protocols regarding taking a suspect into arrest, and applying restraints Law enforcement had established that Juker was under the influence, suicidal, suffering from hallucinogenic ideations and suffering from significant mental health issues.

82. The initial circumstances confronting Pietrzak, Pollard, Rush, and Pollard could not have been perceived by adequately trained and reasonable officers as warranting anything but an opportunity to take Juker into custody while he was being compliant with all of law enforcements demands, on his knees, with his hands in the air and far away from his firearm. Juker's actions to this point necessitated law enforcement to follow protocol and contact the mental health response team and a special crisis negotiator. The exigency to safely take Juker into custody during the prolonged period of complete compliance is tempered by law enforcement's understanding of Juker's diminished mental state, suicidal thoughts, intoxication, and report of hallucination. If protecting officers and protecting the public was paramount to these officers, they would have subdued Juker while he was being compliant, on his knees with his hands on his head and 15 yards from any weapon and would have followed protocol by contacting the mental health response team and a special negotiator.

83. As a direct result of the conduct of Defendants, Juker suffered grave physical gunshot wounds which caused his wrongful death, and Juker's heirs, to wit, his mother, father and sister named as Plaintiffs herein, and his decedents' estate are entitled to recover damages from Defendants for that wrongful death.

84. As a result of Defendant's tortious, intentional, reckless, willful and wanton, negligent and otherwise wrongful and tortious conduct Juker died as a result of the Defendant officers actions named herein including Fiddler, Pietrzak, Pollard, Rush,

Sousa, Rogers, Howarth Lee and Winegar and/or John and Jane Does 1-10, and a direct and proximate result of the acts and omissions of Defendants, as well as their intentional, negligent, reckless, willful, and/or wanton conduct, Plaintiffs have suffered general and/or special damages for the loss of companionship, society, comfort, support, and services lost as a result of their immediate family member's untimely death, medical expenses and funeral expenses in an amount to be determined at trial, aw well as extreme emotional damages.

**FIRST CLAIM FOR RELIEF**

**(Excessive Use of Lethal Force – 42 U.S.C. § 1983: Violations of the Fourth and Fourteenth Amendments to the United States Constitution Asserted Against All Defendants)**

83. Plaintiffs incorporated by reference paragraphs 1-84 as though fully set forth Herein.

84. The wrongful conduct of BPD and Boise constitute violations under the color of state law and 42 U.S.C. § 1983, in that, with deliberate and callous indifference to a known, constitutional right, Defendants deprived Juker of the rights, privileges, and/or immunities secured by the Constitution of the United States.

85. Juker was entitled to be safe and secure from undue and unreasonable force and to be free from the improper and excessive use of lethal force.

86. The acts and omissions of Defendants in using excessive, lethal force on Juker, in this police shooting incident, violated the requirements of the Fourth Amendment and Fourteenth Amendment rights held by Juker to be free from the excessive, unconstitutional use of force, particularly lethal force.

87. The specific actions of Defendants, acting under color of state law and also

individually and/or in concert with each other, alleged to be violations of Juker's protected, constitutional rights are more particularly set forth as follows:

a. Defendants used excessive, lethal, physical force against Juker which caused his death;

b. Defendants knew or should have know that utilizing significantly less force could and should have been used to effectively complete an arrest;

c. Defendants failed to utilize an objectively reasonable assessment of the facts when they decided to fatally shoot Juker and use lethal force against him after Juker had initially surrendered, and Defendants chose not to place him in handcuffs and detain him;

d. None of the law enforcement officers attempted to use a degree of force less than lethal force and the choice to use such lesser degree of force would have been objectively reasonable under the circumstances and as they would have been perceived by a reasonable law enforcement officer faced with these same or similar circumstances.

e. Lee received a call from dispatch to go to Juker's house, but chose to call him rather than going to Juker's residence. Once it was established that Juker was undergoing a mental health crisis, Lee wholly failed to take appropriate measures by contacting the mental health crisis team and a special negotiator.

f. Defendants should have contacted the mental health response team and a special negotiator pursuant to department policies which could have de-escalated the event.

88. The unreasonableness of Defendants' use of excessive, lethal force under these circumstances is well defined by existing law and by the established policies of the BPD and each Defendant knew or reasonably should have known that their conduct was not

only well below the standard prescribed by law but was illegal and unconstitutional *per se.*

89. As a result of the violations of constitutional standards set forth herein, Juker has suffered the injuries described above and has suffered both economic and noneconomic damages and will continue to suffer such damages in the future. The extent of Plaintiff's damages will be more fully proven at trial.

90. Juker's estate has been required to hire attorneys to represent him in this case, and is thus entitled to an award of reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988.

**SECOND CLAIM FOR RELIEF**

**(Conspiracy to Conceal Unlawful, Unconstitutional Conduct – Violations of 42 U.S.C. § 1983 Asserted Against All Defendants)**

91. Plaintiffs incorporate by reference paragraphs 1 through 90 as though fully set forth herein.

92. By engaging in a concerted effort to conceal the wrongfulness of the excessive use of lethal force upon Juker, Fiddler, Pietrzak, Pollard, Rush, Sousa, Rogers, Lee, Howarth, B.P.D. and Boise have engaged in violations, while acting under the color of state law and in violation of 42 U.S.C. § 1983 in that, with deliberate and callous indifference to the truth, they are attempting to deprive Juker of his constitutional claims arising from the use of excessive, lethal force all of which is contrary to Juker's established rights, privileges, and/or immunities secured by the Constitution of the United States.

93. Juker was entitled to be safe and secure from suffering a deprivation of due

process and of the right to recover damages for valid, constitutional claims by virtue of distorted, hyperbolic, and disingenuous statements and testimony by law enforcement officers, law enforcement agencies, and/or governmental entities acting in concert with one another.

94. The acts and omissions of Defendants in conspiring to conceal the illegal use of excessive, lethal force on Juker violated the rights and requirements of the Fourth and Fourteenth Amendments held by Juker under due process of law.

95. The specific actions of Defendants, individually and in concert with each other, alleged to be violations of Juker's protected, constitutional rights in conspiring to deny him due process of law include;

    a.  Claims by Howarth and Lee that they did not take Juker into custody during his initial period of compliance because they feared he had other weapons.

    b.  Claims that Juker still posed a threat even though he was on his knees, with his hands on his head and yards away from any weapon.

96. The unreasonableness of these concerted attempts to conceal the use of excessive lethal force is well defined by existing law, which each Defendant knew or reasonably should have known and which demonstrated that their conduct was not only well below the standard prescribed by law but was illegal and unconstitutional *per se*.

97. As a result of violations of the constitutional standards set forth herein, Juker was killed by Defendants.

98. Juker's estate has been required to hire attorneys to represent them in this case and are thus entitled to an award of reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988.

## THIRD CLAIM FOR RELIEF

### (*Monell* liability)

99. Plaintiffs incorporate by reference paragraphs 1 through 98 as though fully set forth herein.

100. Either Boise, BPD or both adopted an official policy and had a longstanding practice or custom which constituted a policy, or ratified actions, which ratification amounted to a policy, in violation of Juker's constitutional right to be free from the excessive use of lethal force and to be free from damages as a result of the concerted effort to deprive him of due process of law.

101. Boise and BPD failed to exercise appropriate care in the hiring, training and supervising of law enforcement officers so as to insure their officers would be capable of making rational decisions in the course of performing their duties relative to the use of lethal force and relative to faithfully and truthfully reporting the unlawful conduct of other law enforcement officers.

102. Defendants' failure to properly hire, train and supervise their law enforcement officers amounts to deliberate indifference to the rights of persons with whom these law enforcement officers came into contact, to wit, Juker.

103. Had Fiddler, Pietrzak, Pollard, Rush, Sousa, and Rogers been properly hired, trained, and supervised regarding the use of proper arrest procedure and lethal force, and been properly trained in contacting and implementing the mental health crisis response team and a special negotiator Juker would not have been killed, and had they

been properly hired, trained, and supervised to not conspire with others to conceal the unlawful use of lethal force Juker would not have been killed.

104.	As a result of Defendants deficient hiring, training, and supervising practices, policies, and customs Juker was wrongfully, gravely, and horrifically killed and suffered substantial economic and non-economic damages in an amount to be proven at trial.

105.	Juker's estate has been required to hire attorneys to represent him in this case and is thus entitled to an award of reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988.

## FOURTH CLAIM FOR RELIEF

### (Wrongful Death Pursuant to I.C. § 5-311)

106.	Plaintiffs incorporate by reference paragraphs 1 through 105 as though set forth fully herein.

107.	As a result of Defendants Fiddler, Pietrzak, Pollard, Rush, Sousa, Rogers, Howarth and/or John and Jane Does 1-10 shooting of Juker, Juker suffered a wrongful death, and his heirs, to wit, his father, mother and sister, Plaintiffs herein, and his decedent's estate are entitled to recover damages from Defendants for that wrongful death.

108.	As a result of Defendants tortious, intentional, recklessness, willful and wanton, negligent and otherwise tortious conduct, Juker died as a result of the gunshots fired by Defendants Fiddler, Pietrzak, Pollard, Rush, Sousa, Rogers, Howarth and/or John and Jane Does 1-10.

109.	As a direct and proximate result of the acts and omissions of Defendants,

as well as their intentional, negligent, reckless, outrageous, willful, and/or wanton conduct, Plaintiffs have suffered general and/or special damages for the loss of companionship, society, comfort, support, and services lost as a result of their immediate family members untimely death.

110. As a direct and proximate result of the acts and omissions of Defendants, as well as their intentional negligent, reckless, outrageous, willful, and/or wanton conduct, Plaintiffs have suffered extreme, emotional damages, in amounts as may be proven at trial, for the loss and wrongful death of their family member, to wit, son and brother Macey Jaden Juker, a deceased person.

111. Plaintiffs have been required to retain the services of Legacy Legal Group, Chtd. in connection with the prosecution and maintenance of this action and request that attorney fees and litigation costs associated with this representation be paid to Plaintiffs by Defendants.

## DEMAND FOR JURY TRIAL

Pursuant to F.R.C.P. 38(b), Plaintiffs hereby demand a trial by jury on any and all issues properly triable by jury in this action.

## PRAYER FOR RELIEF

112. On the first, second and third claims for relief, Plaintiffs pray for judgment. finding that Juker's protected, constitutional rights were violated;

113. A ruling upon finding that Defendants engaged in an unlawful conspiracy to conceal the use of excessive, lethal force on Juker which caused his death.

114. For all Plaintiffs' complete, general, and special damages against all

Defendants in amounts to be determined at trial, including, but not limited to, all special and general damages to which Juker would have been entitled had he not died as a result of the police shooting which is the primary basis of this action.

115.     Expenses for the care, treatment of Juker incurred upon his death.

116.     Reasonable funeral expenses for Juker.

117.     The present monetary value of Juker's loss of net income and other compensation that he could have earned but for for his wrongful death.

118.     The loss of Juker's society, companionship, comfort, guidance and advice.

119.     The mental anguish of each claimant suffered as a result of Juker's wrongful death.

120.     An award of all other damages which this Court finds just, equitable, and proper in the premises;

121.     On the first, second, and third claims for relief, an award of punitive damages for the severe violations of Juker's constitutional rights, to wit, the excessive use of lethal force against him as well as the conspiracy to deprive Juker of his federal, constitutional rights protected by the Fourth and Fourteenth Amendments to the United States Constitution;

122.     Pursuant to I.C. § 18-3307, liquidated damages in the amount of double the amount of damages awarded by the jury at trial due to the primary cause of death, to wit, the police shooting of Juker by Defendants Fiddler, Pietrzak, Pollard, Rush, Sousa, Rogers, Howarth and/or John and Jane Does 1-10, being the use of a firearm;

123.     An award of Plaintiffs' reasonable fees and costs incurred in this action.

DATED: This 18th day of July 2025.

LEGACY LEGAL GROUP, Chartered

_____
Chip Giles
Attorneys for Plaintiffs