Chip Giles

LEGACY LAW GROUP
Attorneys at Law
285 N.W. Main
P.O. Box 1047
Blackfoot, Idaho 83221

(208) 785-4700
Fax No. 785-7080
ISB #9135

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# IN AND FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBIN JUKER, individually as the natural father of MACEY JADEN JUKER, a deceased person, SHERRY FRANCIS individually as the natural mother of MACEY JADEN JUKER a deceased person and JORDIN JUKER SCHMIDT individually as the natural sister of MACEY JADEN JUKER a deceased person, and the ESTATE OF MACEY JADEN JUKER | Case No.  1:25-cv-00304-DCN  **MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS** |
| Plaintiffs | |
| v. | |
| CHASE FIDDLER, in his official and individual capacities, JASON PIETRZAK, in his official and individual capacities, RYAN POLLARD, in his official and individual capacities KIRK RUSH in his official and individual capacities, CRAIG SOUSA, in his official and individual capacities, DOMINIC ROGERS, in his official and individual capacities, JACOB LEE in his official and individual capacities, JONATHAN HOWARTH in | |

**MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS - 1**

| his official and individual capacities, BOISE POLICE DEPARTMENT a political subdivision of the State of Idaho, RON WINEGAR, in his individual and official capacities CITY OF BOISE, a political subdivision of the state of Idaho JOHN or JANE DOES # 1-10, whose true identities are presently unknown. | |
|---|---|

COMES NOW Plaintiffs, by and through thier attorney of record, Chip Giles of Legacy Law Group and herewith alleges, avers, claims and states as follows as to causes of actions against Defendants:

## I.    INTRODUCTORY STATEMENT

This case arises from violations of Macey Jaden Juker's (hereinafter "Juker") right to be free from the excessive use, by law enforcement officers, of lethal force, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution and to be free from harm attributed to an unlawful conspiracy to conceal the use of excessive force in further violation of Juker's civil rights. As set forth in the Complaint, on the night Juker was killed by Boise City Police officers he was suffering from a mental health crisis. Law enforcement refused to use a special negotiator or the City's Behavioral Health Response Team and refused to take Juker safely into custody when he was on his knees with his hands behind his head fully complying with law enforcement's demands. Juker's death was determined to be a homicide by autopsy and *post mortem* examination as stated on Juker's death certificate filed by the Idaho Bureau of Vital Records and Health Statistics of the Idaho Department of Health and Welfare.

**MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS - 2**

Juker's death was certainly tragic. The killing could have been avoided if the officers involved would have followed protocol, coordinated with a special negotiator and the City of Boise Behavioral Health Response Team and safely apprehended him. Juker's constitutional rights were violated and his life was taken by Boise City Police Officers use of lethal force while other less lethal means of apprehension were available and not used. Accordingly, the claims set forth in Plaintiffs' complaint are actionable, and state claims upon which relief can be granted.

## II.  SUMMARY OF ADDITIONAL ALLEGATIONS

Juker has also informed dispatch he had a firearm, and that he was home alone. Lee then decided to contact Juker directly by phone for some reason, rather than responding to Juker's residence. (Dk. 5 ¶ 25). Lee stopped in the parking lot/strip mall area located at 1650 W. State Street. Lee advised other officers to come meet him at the same location. Lee did not contact the Behavioral Health Response Team or a crisis negotiator. (*Id*. ¶ 26). Juker was undoubtedly scared, intoxicated, suicidal, suffering from hallucinations and a diminished mental state. Juker was armed with a rifle, but complied fully with Rush and Pollard's commands, placing the rifle down some distance from him, and then placing his hands on his head, Juker remained in that position for some time. (*Id*. ¶ 32). Juker was not taken into custody at this time, when he was far from his weapon and was completely compliant with law enforcement, on his knees with his hands on his head. Even though Juker was suffering a mental health crisis, neither the mental health response team nor a special negotiator were contacted. (*Id*. ¶ 33).  Juker was told to walk toward law enforcement, to distance himself further from the rifle. Juker complied, walking towards law enforcement approximately 15 yards from the rifle. It is unknown

**MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS -  3**

while he was compliant why officers did not tell him to walk farther from the rifle, or just take him into custody. Juker was told to stop and get down on his knees with his hands above his head, which he did. Again, neither the mental health crisis team nor a special investigator were ever contacted. (*Id*. ¶ 34).

It was mentioned by one law enforcement officer that they were "going to end this pretty quick," perhaps indicating an intent to simply kill Juker rather than follow standard protocols, bring in a special negotiator and contact the mental health crisis team. At this time Juker was clearly fixated on a strong fear of law enforcement. (*Id*. ¶ 35).  Upon information and belief, at this time Juker was only under investigation for unlawful discharge of a firearm, and perhaps resisting and obstructing law enforcement personnel, both misdemeanor crimes under Boise City and Ada County criminal codes. (*Id*. ¶ 36). As numerous law enforcement closed in on Juker, with emergency lights and sirens activated, Juker jumped up to run and grabbed his rifle. (*Id*. ¶ 37).  While on the run, Juker fired his weapon seemingly in the air, and was then shot by officers multiple times. As Juker was being shot, he did fire his weapon, no one (law enforcement bystander or otherwise) was injured by any of these shots. (*Id*. ¶ 38).  According to the scene investigation 26 rounds of 9mm were fired by law enforcement and 7 rounds of 223 for a total of 33 rounds. (*Id*. ¶ 39).

Pietrzak knew Juker was initially being compliant with law enforcement. (*Id*. ¶ 66).  Rush retrieved his rifle from the backseat of his vehicle. He then commanded Juker to "drop the gun" and "get your hands above your head." Rush "clears the air" over the police radio, and advises they are in contact with a suspect containing a "long gun." Rush

**MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS - 4**

witnesses Juker following commands and being compliant with law enforcement. (*Id*. ¶ 73). Juker is advised to get on his knees, and Juker complies. Pietrzak arrives and Rush briefs him. (*Id*. ¶ 74).

The shots that were eventually fired killed Juker. The autopsy listed his death as homicide from multiple gunshot wounds from rifles and handguns. Medical records show that Juker was shot 9 times. The shooting occurred after Juker was compliant with officers, approximately 15 yards from his weapon, on his knees with his hands above his head. Law enforcement was well aware of Juker's mental and physical state, and even though Juker was initially compliant for some time, ignored numerous opportunities to detain Juker without the use of deadly force. Additionally, the mental health crisis team and a specially trained crisis negotiator were never contacted. (*Id*. ¶ 80).

The use of a firearm constitutes the use of lethal force and, upon information and belief, pursuant to the established policy of Boise and BPD, is "using only the amount of force necessary to protect officers or others from imminent danger of death or serious bodily injury." It also allows for the use of deadly force to prevent the escape of a felony suspect if their freedom is believed to pose a significant threat to officer or others. Even without this policy, properly-trained officers would not delay an opportunity to take a compliant suspect, on his knees, with his hands in the air and far away from his firearm into custody. Had officers followed Boise and BPDs policy and protocol associated with safely taking a suspect into custody to include contacting the mental health response team and a special negotiator Juker would have been arrested and detained during the time when he was being compliant, on his knees with his hands on his head and at least 15 yards away from any weapon. Boise and BPD's protocols regarding taking a suspect into

**MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS - 5**

arrest, and applying restraints Law enforcement had established that Juker was under the influence, suicidal, suffering from hallucinogenic ideations and suffering from significant mental health issues. (*Id*. ¶ 81).

The initial circumstances confronting Pietrzak, Pollard, Rush, and Pollard could not have been perceived by adequately trained and reasonable officers as warranting anything but an opportunity to take Juker into custody while he was being compliant with all of law enforcements demands, on his knees, with his hands in the air and far away from his firearm. Juker's actions to this point necessitated law enforcement to follow protocol and contact the mental health response team and a special crisis negotiator. The exigency to safely take Juker into custody during the prolonged period of complete compliance is tempered by law enforcement's understanding of Juker's diminished mental state, suicidal thoughts, intoxication, and report of hallucination. If protecting officers and protecting the public was paramount to these officers, they would have subdued Juker while he was being compliant, on his knees with his hands on his head and 15 yards from any weapon and would have followed protocol by contacting the mental health response team and a special negotiator. (*Id*. ¶ 82).

### III. MOTION TO DISMISS STANDARD

In *Twombly* the Supreme Court reinterpreted the substance of Rule 8(a), holding that plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face," to avoid 12(b)(6) dismissal. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007). Additionally, Rule 8(a) does not require "detailed factual allegations," but demands more than an "unadorned accusation." *Id*. at 555. *Twombly* also ruled that the

MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS - 6

plausibility standard is not akin to a "probability requirement," but requires more than a sheer "possibility" that a defendant has acted unlawfully. *Id*.

### IV. ARGUMENT

Plaintiff's complaint sufficiently, and plausibly, alleges that the defendants acted under color of state law and their conduct deprived Juker not only of constitutional protections from undue and unreasonable force and the improper use of excessive lethal force, but also his life. These are the plausible wrongs that support Juker's constitutional claims, and his surviving family member's wrongful death claim.

### A.    *Qualified Immunity.*

Qualified immunity exists to protect actions in the "hazy border between excessive and acceptable force." *Brosseau v. Haugen* 543 U.S. 194, 201 (2004). "The doctrine of qualified immunity – though absent from the text of § 1983 acts to safeguard government, and thereby to protect the public at large, not to benefit its agents." *Wyatt v. Cole*, 504 U.S. at 168, 112 S.Ct.1827.   "Our touchstone in evaluating an officer's use of force is objective reasonableness." *See Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (citing *Scott v. United States*, 436 U.S. 128, 137–39, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)). Qualified immunity does require a two-step analysis; (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) if so, whether that right was "clearly established" at the time of defendant's conduct." *Pearson v. Callahan*  129 S. Ct. 808, 811 (2009).

The officers involved in Juker's killing ignored protocol, and an opportunity to safely apprehend him by non-lethal means. Law enforcement's actions ignored Juker's then mental state and an opportunity to bring Juker in safely, which would have saved his

life. Juker had clearly defined constitutional protections against undue and unreasonable force and the improper use of excessive lethal force. These constitutional protections were clearly established when law enforcement first spoke with him, and they were violated when officer's ignored protocol, and eventually killed Juker.   Thus, the defendants should not be entitled to qualified immunity.

1. <u>The officers used excessive force, while Juker had a clearly established right to be free of deadly force.</u>

Defendants argue that excessive force was not used in Juker's killing, and set forth the Ninth Circuit's four factor test for reasonableness which include (1) "the type and amount of force inflicted," (2) "the severity of the crime at issue," (3) "whether the suspect posed an immediate threat to the safety of the officers or others," and; (4) "whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Odoan v. Sanford*, 991 F.3d 1027, 1037 (9th Cir. 2021). In light of the Ninth Circuit's four factor analysis, other factors may also bear on the reasonableness analysis, such as "whether less intrusive means are available, whether any warning was given before the force is employed, and whether special caution should be exercised when an arrestee shows signs of mental instability." *Alves v. Cnty of Riverside*, 135 F.4th 1161, 1169 (9th Cir. 2025). the "reasonableness" inquiry in an excessive force case is an objective one: "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." See *Scott v. United States,* 436 U.S. 128, 137–139, 98 S.Ct. 1717, 1723–1724, 56 L.Ed.2d 168 (1978); see also *Terry v. Ohio, supra,* 392 U.S., at 21, 88 S.Ct., at 1879.

**MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS - 8**

The officer's actions here were not objectively reasonable. As alleged in Plaintiff's complaint, law enforcement refused to use the City of Boise Behavioral Health Response Team, or a special negotiator throughout the entire interaction between Juker and law enforcement. Rather than go to Juker's house to further investigate the situation, or apprehend him, Officer Lee chose to simply speak with Juker on the phone, even after it was determined that Juker was suffering a mental health crisis, was suicidal, intoxicated and a danger to himself and others. Finally, law enforcement refused to safely take Juker into custody when they had an opportunity, at the point that Juker was on his knees, yards away from any weapon, and being completely compliant. It was at that point, consistent with his current mental instability, Juker grabbed his gun, ran and fired it into the air. Had law enforcement followed protocol, and safely apprehended Juker when they had the chance Juker's killing would have been avoided. Law enforcements unreasonable actions in not safely apprehending an individual undergoing a mental health crisis when given the opportunity led to a wrongful use of deadly force, in violation of Juker's clearly established right against the use of such force.

**B.      Plaintiff's have plausibly alleged a conspiracy.**

The officers involved in Juker's killing did engage in unreasonable, unlawful and unconstitutional conduct. "To establish the defendants' liability for a conspiracy, a plaintiff must demonstrate the existence of " 'an agreement or 'meeting of the minds' to violate constitutional rights." " *United Steelworkers of America v. Phelps Dodge Corp.,* 865 F.2d 1539, 1540–41 (9th Cir.1989) (en banc) (quoting *Fonda v. Gray,* 707 F.2d 435, 438 (9th Cir.1983)). "The defendants must have, by some concerted action, intend[ed] to accomplish some unlawful objective for the purpose of harming another

MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS - 9

which results in damage." *Gilbrook v. City of Westminster,* 177 F.3d 839, 856 (9th Cir.1999) (quoting *Vieux v. East Bay Reg'l Park Dist.,* 906 F.2d 1330, 1343 (9th Cir.1990)). "Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." *See id.* at 856. "For example, a showing that the alleged conspirators have committed acts that are unlikely to have been undertaken without an agreement may allow a jury to infer the existence of a conspiracy." *Kunik v. Racine County,* 946 F.2d 1574, 1580 (7th Cir.1991).

As plead in Plaintiff's Complaint, Howarth and Lee admit they did not take Juker into custody during his initial period of compliance because they feared he had other weapons (Dk. 5 ¶ 95). Howarth and Lee also claimed that Juker somehow still posed a threat even though he was on his knees, with his hands on his head, and yards away from any weapon.

At that point, even if Juker had other weapons (which he did not) a reasonable law enforcement officer would have taken him into custody immediately. Neither Howarth nor Lee did so, acting in concert. Howarth and Lee's wrongful inaction at this point led directly to the unconstitutional use of deadly force against Juker. These claims are not bald conjecture, rather plausible allegations against the defendant at the pleading stage of this case.

### C.    The Complaint plausibly states a claim against the city.

As set forth by Defendants, Monell liability can be proven in various ways. *See, e.g. Ellins v. City of Sierra Madre,* 710 f.3d 1049, 1066 (9th Cir. 2013) (expressly adopted official policy or widespread or longstanding practice or custom); *Lytle v. Carl,* 382 F.3d 978, 981 (9th Cir. 2004) (acts of final policymaker); *Christie v. Iopa*, 176 F.3d 1231, 1239

(9th Cir. 1999) (ratification); *Tsao v. Desert Palace, Inc*. 698 F.3d 1128 (9th Cir. 2012)(failure to train or supervise). The United States Supreme Court held that "[E]gregious attempts by local governments to insulate themselves from liability for unconstitutional policies are precluded by allowing plaintiffs to prove that 'a widespread practice' has been established by " 'custom or usage' with the force of law." *St. Louis v. Praprotnik* 485 U.S. 112, 127 (1998).

Ratification of official policy and/or longstanding practices and customs creating Monell liability are plausibly alleged in Plaintiffs' complaint. The allegations include: Either Boise, BPD or both adopted an official policy and had a longstanding practice or custom which constituted a policy, or ratified actions, which ratification amounted to a policy, in violation of Juker's constitutional right to be free from the excessive use of lethal force and to be free from damages as a result of the concerted effort to deprive him of due process of law. (Dk. 5 ¶ 100); Boise and BPD failed to exercise appropriate care in the hiring, training and supervising of law enforcement officers so as to ensure their officers would be capable of making rational decisions in the course of performing their duties relative to the use of lethal force and relative to faithfully and truthfully reporting the unlawful conduct of other law enforcement officers. (Dk. 5 ¶ 101); Defendants' failure to properly hire, train and supervise their law enforcement officer's amounts to deliberate indifference to the rights of persons with whom these law enforcement officers came into contact, to wit, Juker. (Dk. 5 ¶ 102); Had Fiddler, Pietrzak, Pollard, Rush, Sousa, and Rogers been properly hired, trained, and supervised regarding the use of proper arrest procedure and lethal force, and been properly trained in contacting and implementing the mental health crisis response team and a special negotiator Juker would

MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS - 11

not have been killed, and had they been properly hired, trained, and supervised to not conspire with others to conceal the unlawful use of lethal force Juker would not have been killed. (Dk. 5 ¶ 103); As a result of Defendants deficient hiring, training, and supervising practices, policies, and customs Juker was wrongfully, gravely, and horrifically killed and suffered substantial economic and non-economic damages in an amount to be proven at trial. (Dk. 5 ¶ 104).

These allegations plausibly state a claim against the City of Boise, and or the Boise Police Department regarding longstanding, and deficient practices and policies including training, hiring and supervising officers to safely apprehend individuals without violating their constitutional rights and allowing escalation to lead to deadly force.

**D.      Plaintiff's have a plausible wrongful death claim.**

In Idaho wrongful death actions are governed by Idaho Code § 5-311, which provides in relevant part:

> When the death of a person is caused by the wrongful act or neglect of another, his or her heirs or personal representatives on their behalf may maintain an action for damages against the person causing the death, or in case of the death of such wrongdoer, against the personal representative of such wrongdoer, whether the wrongdoer dies before or after the death of the person injured. If any other person is responsible for any such wrongful act or neglect, the action may also be maintained against such other person, or in the case of his or her death, his or her personal representative. In every action under this section, such damages may be given as under all the circumstances of the case as may be just.

To prevail, a plaintiff must prove (1) that an actionable wrong was committed by the defendant against the decedent, and (2) that the same actionable wrong caused the decedent's death." *Castorena v. General Elec.*, 149 Idaho 609, 619 (2010). The

**MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS - 12**

"actionable wrong" committed by the Defendants here is arguably the worse wrong they could have committed against Juker. They killed him. The wrong committed was the direct and proximate cause of Juker's death, fulfilling both of the factors set forth above in *Castorena*. These allegations are plausibly alleged in Plaintiffs' complaint against Defendants Fiddler, Pietrzak, Pollard, Rush, Sousa, Rogers, Howarth and/or John and Jane Does 1-10, explaining the wrong committed by these defendants, and how it proximately led to Juker's death, and his family's cause of action for wrongful death. Thus, the Plaintiff's have plausibly alleged their wrongful death claim.

CONCLUSION

Plaintiff's respectfully request that Defendants' motion to dismiss be denied on the basis of qualified immunity because the officers wrongfully and unconstitutionally used excessive force for which Juker had a constitutional protection against. Plaintiffs further request that Defendant's motion to dismiss the conspiracy, Monell and wrongful death claims be denied. Alternatively, if the court does find Plaintiff's complaint deficient under Federal Rule of Civil Procedure 8(a) and/or the *Twombly/Iqbal* standard, that Plaintiff's be granted leave to file an amended complaint.

DATED this 29th day of September, 2025.

Legacy Legal Group

By:/S/ Chip Giles
   Chip Giles, of the Firm
   Attorney for Plaintiffs

**MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS - 13**

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 29th day of September, 2025 I caused to be electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following people:

Reid K. Peterson
reid@nelsonwilliamslaw.com

Tyler Williams
tyler@nelsonwilliamslaw.com

Attorneys for Defendants